IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Bankr. No. 08-12136-BLS |
| MOTOR COACH INDUSTRIES | ) (Jointly Administered) |
| INTERNATIONAL, INC., et al., | ) |
| | ) |
| Debtors. | ) |
| THE OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF | ) |
| MOTOR COACH INDUSTRIES | ) |
| INTERNATIONAL, INC., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) Civ. No. 09-078-SLR |
| | ) |
| MOTOR COACH INDUSTRIES | ) |
| INTERNATIONAL, INC., et al., | ) |
| | ) |
| Appellees. | ) |

**MEMORANDUM ORDER**

At Wilmington this 10th day of February, 2009, having reviewed appellant's motion to stay pending appeal and the papers submitted by the parties in connection therewith, and having heard oral argument on the same;

IT IS ORDERED that said motion (D.I. 2) is denied, for the reasons that follow:

1. **Standard of review.** A party seeking a stay pending appeal must prove, by clear and satisfactory evidence, that (a) it is likely to prevail on the merits of its appeal; (b) it will suffer irreparable injury absent a stay; (c) a stay will not cause substantial harm to other interested parties; and (d) a stay will not harm the public interest. *See*

*Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). Although none of the above factors is determinative, courts rarely exercise their discretion in favor of a moving party who has failed to demonstrate a likelihood of success on the merits or irreparable harm. With respect to the former, a movant must demonstrate that it has "a substantial issue to raise on appeal." *In re Countrywide Home Loans, Inc.*, 387 B.R. 467, 480 (Bankr. W.D. Pa. 2008). With respect to the latter, equitable mootness of an appeal, without more, does not constitute irreparable harm. *See In re Global Home Products LLC*, Civ. No. 06-508-JJF, 2006 WL2381918 (D. Del. Aug. 17, 2006).

    2. **Background.** The bankruptcy proceedings that preceded the instant appeal are not atypical in the District of Delaware. Debtors, facing a challenging economy and approximately $505 million of secured debt financing, tried to refinance their debt or sell themselves for an amount close to their level of secured debt. Having failed in these efforts, debtors worked out a restructuring with Franklin Mutual Advisers, LLC ("Franklin"), who served as the investment manager of funds holding approximately 90% of the debtors' outstanding third lien debt. Franklin agreed to support a plan of reorganization (the "Plan") providing, *inter alia*, that: (a) debtors' obligations under the first lien credit agreement would be repaid in full during the pendency of the bankruptcy proceedings with proceeds of debtors' DIP financing facilities; (b) debtors' obligations outstanding on the date the Plan was consummated (and debtors exited bankruptcy) under the second lien credit agreement would be repaid in full with the proceeds of a $160 million rights offering described below; (c) debtors' prepetition third lien lenders

would convert their debt into common equity of the reorganized company; and (d) Franklin would backstop a $160 million rights offering of convertible preferred equity in the reorganized company. Franklin and the debtors memorialized this understanding in an agreement dated September 14, 2008 (the "Lock-Up Agreement"). The Lock-Up Agreement and, with it, Franklin's commitment to provide $160 million in new equity, terminates if the Plan is not consummated by February 28, 2009. Because the terms of the Lock-Up Agreement implied that debtors' total enterprise value was approximately $420 million, well below the total amount of secured debt outstanding at the time, the Plan did not contemplate any recovery for unsecured creditors. On September 16, 2008, each of the debtors filed a voluntary petition for relief under chapter 11 of the bankruptcy code.

3. On September 16, 2008, the bankruptcy court conducted a "first day hearing." Among the "first day" motions filed by debtors was a "critical vendors" motion ("the Motion"), whereby debtors sought authority to pay the prepetition claims of certain trade vendors who provided goods that were critical to debtors' reorganization efforts and who would have been unlikely to continue to supply goods if debtors did not immediately pay their prepetition claims.[1] After reviewing the papers and hearing testimony from debtors' chief financial officer,[2] the bankruptcy court granted the Motion

---

[1] These vendors included: (a) sole suppliers; (b) suppliers from which debtors were contractually obligated to purchase goods; (c) suppliers from which debtors had to purchase goods under the "Buy America" program; and (d) suppliers who may have gone out of business but for the payments.

[2] Joseph Michael McIlwain ("McIlwain"), who was cross-examined in this regard by the U.S. Trustee's office.

3

on an interim basis.[3]

4. Following the appointment of the Official Committee of Unsecured Creditors ("the Committee") on September 24, 2008, the bankruptcy court held a final hearing on the Motion on October 7, 2008. Prior to the hearing, debtors provided to the Committee the list of all 336 vendors that had been designated as critical and once again proffered McIlwain's testimony. The Committee, having declined to cross-examine McIlwain or otherwise supplement the record on this issue, stated as follows:

> Eighty plus percent of trade unsecured creditors being paid, on top of that many tens of millions paid under other doctrine of necessity rubric type motions and orders, presents plan related issues that we will raise, and hopefully resolve consensually; if not, Your Honor will resolve at another day when we are dealing with the Plan.
>
> But it is an issue for purposes of all unsecured creditors. They, you know, rely upon me to stand up. They are not forgotten.

(D.I. 6, ex. E at 23) The bankruptcy court adopted the record and the evidence from the first day hearing, found that debtors had carried their burden of proof, and approved and authorized the relief sought in the Motion on a final basis. There was no appeal from that order, and there have been no further proceedings pursuant to 11 U.S.C. § 549 (disgorgement actions) related to the Motion.

5. At the confirmation hearing, the Committee objected to the Plan based on the

---

[3]In this regard, the bankruptcy court found that the debtors had "carried their burden [of identifying] . . . those companies that supply product that are absolutely essential to the debtors' ongoing business and, as a practical matter based upon the record, to its survival." (D.I. 18, ex. D at 70)

4

payments made to critical vendors under the Motion.[4] According to the Committee, the effect of the Motion was to create two classes of unsecured claims under the Plan, the "haves" (the critical vendors who received payments under the Motion and are further immunized from disgorgement of these payments under the Plan) and the "have-nots" (the remaining unsecured creditors), in violation of 11 U.S.C. § 1129(b). Although the Committee also questioned, in passing, the viability of using the "doctrine of necessity" to justify the granting of such relief as that requested in the Motion,[5] ultimately the Committee's argument centered on the proposition that it could have demonstrated, had it been allowed to do so,[6] that the claims paid by debtors under the auspice of the Motion were not always necessary to ensure business continuation. In this regard, the Committee argued that such payments were in effect plan distributions which unfairly discriminated among similarly situated creditors, that is, unsecured creditors. (D.I. 6, ex. M at 31-57)

6. The bankruptcy court overruled the objections posed to the Plan by the Committee, finding in relevant part that: (a) the unsecured creditors were "out of the money;" (b) the critical vendors did not constitute a separate class for purposes of plan

---

[4]It is important to note that the Committee withdrew its objection based on valuation. (D.I. 6, ex. M at 31)

[5]The "doctrine of necessity" or "necessity of payment" doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor. See Matter of Lehigh & N.E. Ry. Co., 657 F.2d 570, 581-82 (3d Cir. 1981); In re Just For Feet, Inc., 242 B.R. 821, 824-25 (D. Del. 1999); Matter of Columbia Gas Sys., Inc., 171 B.R. 189, 192 (Bankr. D. Del. 1994).

[6]The bankruptcy court had previously granted debtors' motion in limine precluding the Committee from presenting such evidence at confirmation.

confirmation and, like the other unsecured creditors, did not receive any distributions under the Plan; (c) the order granting the Motion was final; and (d) the release and disposition of § 549 actions under the Plan was justified under the facts and circumstances of the case. The bankruptcy court denied a stay of its order confirming the Plan, concluding that the Committee was not likely to succeed on the merits of its appeal and, on balance, the harm to debtors was substantially greater than that to the Committee, based in large measure on the fact that the unsecured creditors were out of the money under any valuation. (D. I. 6, ex. M)

7. The Committee presents the same arguments for stay here as summarized above in connection with the confirmation hearing. Consistent with the conclusion of the bankruptcy court, I find that the balance of harms favors debtors[7] and that the Committee has not identified a substantial issue to raise on appeal. With respect to the latter, the viability of the "doctrine of necessity" has not been brought into serious question by courts in the Third Circuit. Moreover, the critical vendors motion at bar was supported by an adequate evidentiary record that the Committee chose not to test at the time the Motion was being considered on its merits.[8] The record further demonstrates that the estate (the value of which, again, the Committee chose not to test at the confirmation hearing) has insufficient assets for a distribution to the class of unsecured creditors under the Plan; therefore, the class of unsecured creditors

---

[7]In this regard, I note again that equitable mootness of an appeal does not constitute irreparable harm and that debtors face a February 28, 2009 deadline for the restructuring transaction to be completed.

[8]Although the Committee characterized its concerns as being "Plan" related and reserved all rights, in reality, such legal posturing did not move the process forward.

identified in the Plan all receive the same distribution under the Plan, consistent with § 1129(b). The fact that some of the critical vendors received payments outside the Plan as "gifts" from the secured lenders is not a legally sufficient reason to reject confirmation of the Plan. Finally, the Committee's effort to prove, at confirmation, that debtors failed to follow the critical vendor order[9] strikes me as an effort to transform a procedural failing on the Committee's part to a substantive right. I decline to do so.

8. In the end, I agree with the Committee that bankruptcy proceedings go forward with the expectation that negotiations among the interested parties should proceed to afford the greatest number of creditors the greatest return on their investments. In this case, like many cases, the art of negotiation was unavailing because there were insufficient assets to pay the secured lenders. I respect the Committee's obligations to its members. Nevertheless, I am convinced that the Committee had a full and fair opportunity to present evidence in support of its factual contentions and that its legal arguments fail as a matter of law and on the record at bar. Therefore, I conclude that the Committee has failed to carry its burden to prove that a stay pending appeal is justified.

_____
United States District Judge

---

[9] Again, as I understand it, this is worthy of proof because the Committee argues that such improper payments should be deemed Plan distributions in violation of § 1129(b).